1  Lee Ira Garbowitz
2      E-mail address: lee@garbowitz.com
3  3121 Oakdell Lane
4  Studio City, California 91604
5  Telephone number: (323) 703-4913
6  In Pro Se

7  UNITED STATES DISTRICT COURT
8  CENTRAL DISTRICT OF CALIFORNIA

**CV09 2713 · DSF(VBKx)**

9   Lee Ira Garbowitz,              )
10  Plaintiff                       )
11      vs.                         )
12  United States of America,       ) COMPLAINT FOR
13  United States Treasury,         ) BREACH OF CONTRACT
14  FDIC as Receiver of             )
15  Indymac Bank F.S.B.             )
16  Defendant                       )

17                        COMPLAINT

18  COMES NOW the plaintiff, LEE IRA GARBOWITZ appearing pro se, and

19  for a complaint against the defendant above named, states, alleges, and avers

20  as follows:

21                        JURISDICTION

22  1. This Court has subject matter jurisdiction under 28 U.S.C. section 1491

23  (a) (1).  This complaint is for monetary award from a department of the

24  United States Treasury or the FDIC as Receiver.

25
26
27
28

4/20/2009 11:58:37 AM Receipt #: 117970
            Cashier: LUNG [LA 1-1]
Paid by: JI BAR304177
2009-82500    5 - Civil Filing Fee (1)
                              $60.00
Amount:
2:CV09-82713    11 - Special Fund F/F (1)
2009-51000                    $190.00
Amount:
2:CV09-82713
2009-806400    Filing Fee - Special (1)
Amount :                      $100.00
Credit Card Payment : 2009 565650 / 350.0
0

## GENERAL ALLEGATIONS

2. The plaintiff, LEE IRA GARBOWITZ is a citizen of the State of California, United States of America and was employed by Indymac Bank a publically held company based in Pasadena, California, from April 2, 2007 until July 7, 2008.

3. On May 7, 2008, while an employee of Indymac Bank, the plaintiff, LEE IRA GARBOWITZ received a supplemental severance payment agreement which entitled the plaintiff to 12 months of base salary, amounting to $247,000, if the plaintiff's employment was terminated on or before December 31, 2011. At Indymac Bank, it was the standard practice to provide its senior executives with a severance agreement after their first year of employment which provided financial benefits to the employee in the event of an involuntary termination. The supplemental severance agreement is included as part of this complaint and attached as Exhibit A.

4. On May 15, 2008, while an employee of Indymac Bank, the plaintiff, LEE IRA GARBOWITZ received a retention loan from Indymac Bank approved by the Board of Directors in the principal sum amount of $185,250. He was among approximately eighty senior executives to receive the retention loan which was intended to retain key staff, keep Indymac Bank safe and sound, and to return to bank to profitability. The terms of the note provide for the amount of the retention loan to be set off from severance in the event of involuntary termination. The promissory note is included as part of this complaint and attached as Exhibit B.

5. On July 7, 2008, the plaintiff, LEE IRA GARBOWITZ, received notice of termination from Indymac Bank. The plaintiff's position was being eliminated due to a restructuring. Under these circumstances of involuntary termination due to the elimination of his position, the retention loan would be set off against the severance agreement found in the supplemental severance agreement. The letter of termination is included as part of this complaint and attached as Exhibit C.

6. On July 7, 2008, the plaintiff, LEE IRA GARBOWITZ, received a restructuring frequently asked questions specialty list from Indymac Bank acknowledging that no acceleration of the promissory note would be forthcoming due to involuntary termination and would be credited at earned income. The restructuring frequently asked questions specialty list is included as part of this complaint and attached as Exhibit D.

7. On September 8, 2008, the plaintiff, LEE IRA GARBOWITZ received his final paystub from Indymac Bank. The paystub itemized the Retention Loan as earnings indicating that in the loan had been forgiven by Indymac Bank and its successor. The final paystub is included as part of this complaint and attached as Exhibit E.

8. On September 12, 2008 the plaintiff, LEE IRA GARBOWITZ filed a Claim in Receivership with the FDIC as Receiver of Indymac Bank, F.S.B. for unpaid severance in the amount of $61,750 based upon the terms of the supplemental severance agreement. The $61,750 constituted 12 months of the plaintiff's base salary of $247,000 net of the retention loan forgiven in the amount of $185,250. The claim is included as part of this complaint and attached as Exhibit F.

9. The FDIC as Receiver of Indymac Bank, F.S.B. disallowed the claim (Exhibit F) and informed the plaintiff, LEE IRA GARBOWITZ, by certified letter. The certified letter which was dated February 19, 2009 was picked up by the plaintiff, LEE IRA GARBOWITZ at the Studio City, California post office on or about February 28, 2009. The letter was unstamped and postage due, and the plaintiff, LEE IRA GARBOWITZ paid for the certified letter. The basis provided for the disallowance of the claim by the FDIC was that "The payment specified by the Supplemental Severance Agreement was contingent on termination at a time of financial distress. Thus any payment pursuant to the agreement violates 12 C.F.R Part 359 prohibiting golden parachutes." The certified letter is included as part of this complaint and attached as Exhibit G. A copy of the text of 12 C.F.R Part 359.1 (f) which provides the FDIC's definition for golden parachutes is included as part of this complaint and attached as Exhibit H.

10. On or about April 8, 2009 the plaintiff, LEE IRA GARBOWITZ contacted Mr. Jeffry M. Quick, claims agent assigned by the FDIC to the plaintiff's, LEE IRA GARBOWITZ claim. The plaintiff, LEE IRA GARBOWITZ asked Mr. Quick if there was any option besides for the plaintiff, LEE IRA GARBOWITZ to file a lawsuit to dispute the disallowance of the claim, indicating that 12 U.S.C. Section 1821 (d) (6) allowed for administrative review of the claim. The conversation with Mr. Quick indicated that administrative review was not an option, and to dispute the disallowance of the claim the plaintiff, LEE IRA GARBOWITZ had to file a lawsuit.

11. Reviewing the certified letter (Exhibit G), taking each of the sentences from the FDIC's disallowance in turn, in the first sentence; "The payment

specified by the Supplemental Severance Agreement was contingent on termination at a time of financial distress.", here the FDIC seems to contend that the supplemental severance agreement had a requirement that in order to pay severance the termination had to occur during a time of financial distress. The supplemental severance agreement (Exhibit A) does not include any contingencies that termination had to occur during a time of financial distress to require payment by Indymac Bank to the plaintiff, LEE IRA GARBOWITZ. The agreement simply provides for 12 months of the employee base salary to be paid to the plaintiff, LEE IRA GARBOWITZ if his employment is terminated on or before December 31, 2011.

Furthermore, the second sentence in the disallowance contents that "Thus any payment pursuant to the agreement violates 12 C.F.R Part 359 prohibiting golden parachutes.", or contending that the supplemental severance agreement is a golden parachute. The text of 12 C.F.R. Part 359 define five specific events, any of which have to be met, in order for a contract to be defined as a golden parachute. The five events are; insolvency of institution, appointment of conservator or receiver, determination that the institution is in troubled condition, the institution has been informed in writing that is has been assigned a 4 or 5 composite rating under the Uniform Financial Institutions Rating System of the Federal Financial Institutions Examination Council, and the institution is subject to a proceeding to terminate or suspend deposit insurance.

When the Supplemental Severance Agreement was issued on May 7, 2008, Indymac Bank was not insolvent, nor in receivership (occurred July 11, 2008), not defined as a troubled institution (occurred July 1, 2008), had a 3 composite rating under the Uniform Financial Institutions Rating System of

the Federal Financial Institutions Examination Council (written notice of rating downgrade to a 5 composite rating occurred June 25, 2008), and Indymac Bank was not subject to proceeding to terminate or suspend its deposit insurance. None of the events delineated in of the golden parachute definition per 12 C.F.R Part 359 were met as of May 7, 2008 when the supplemental severance agreement was provided to the plaintiff, LEE IRA GARBOWITZ, therefore the supplemental severance agreement is not a golden parachute.

12. Furthermore, page 61 of the audit report issued by the office of Inspector General of the Department of the Treasury, which has responsibility for the FDIC, entitled "Material Loss Review of Indymac Bank, FSB (OIG-09-032)" clearly recognizes that restrictions on severance payments and other "golden parachute payments" came into effect on July 1, 2008 when the OTS sent a Troubled Conditions Letter to Indymac Bank. So while the plaintiff, LEE IRA GARBOWITZ, would in no way concede that the supplemental severance agreement is not a golden parachute, if for a moment you assume it was, this statement by the Department of Treasury indicates that it would be permissible since restrictions on golden parachute payments came into effect after the date of the supplemental severance agreement. Page 61 of the Material Loss Review of Indymac Bank, FSB (OIG-09-032) is included as part of this complaint and attached as Exhibit I.

13. On March 19, 2009 the plaintiff, LEE IRA GARBOWITZ, received a letter from the FDIC requesting repayment of the retention loan. The letter states "Under Section II.c. of the Note, in the event of involuntary termination without cause, any contractual severance amounts due would have been credited towards any outstanding loan balance and accrued

interest. However, upon termination of the employment agreements, all contractual severance agreement were also automatically terminated effective July 11, 2008". The plaintiff, LEE IRA GARBOWITZ, never had an employment agreement with Indymac Bank, so it unclear how this applies to the plaintiff, LEE IRA GARBOWITZ. Again, per the terms of the retention loan (Exhibit B) the amount of the loan is to be deducted from severance in the event of an involuntary termination. This letter is attached to this complaint as Exhibit J.

14. In summary the plaintiff, LEE IRA GARBOWITZ submits that he:

A. He was provided with a severance agreement that was offered in the normal course of business after one year of employment at Indymac Bank.

B. He was terminated involuntary from Indymac Bank.

C. He was provided with written affirmation that the retention loan was forgiven from both the restructuring frequently asked question specialty list and via his final paystub.

D. He had his claim for unpaid severance disallowed by the FDIC which erroneously equated the supplemental severance agreement to a golden parachute.

E. He received correspondence from the FDIC changing their position on forgiving the retention loan, now asking for repayment of the loan on the basis of the termination of an employment agreement that does not exist.

F. He was forced into litigation, not offered administrative review by the FDIC.

G. He has been treated by the FDIC in a seemingly random and arbitrary manner. In similar situations, other former Indymac Bank senior manager's severance agreements have not been called into question as a basis for their claims being disallowed. The FDIC is sending notices without postage, referring to contracts that do not exist, and adding words into the contacts that do exist.

H. He has been singled out by the FDIC and is being treated on an unequal basis. Other Indymac Bank senior manager that were not involuntary terminated by Indymac Bank and it successor Indymac Bank F.S.B. under the FDIC's leadership were provided with retention loan forgiveness and generous severance packages. The FDIC seems to be singling out the individuals that were hurt most; those that have been involuntary terminated, made unemployed, and forced into litigation; and rewarding those that they continued to employ with loan forgiveness and severance.

## FIRST CLAIM OF RELIEF

WHEREFORE, the plaintiff, LEE IRA GARBOWITZ, does pray that the Court issue an award of actual direct compensatory damages of $59,868.50 based on the supplemental severance payment agreement in the amount of $247,000 to be set off by the terms of the promissory note amount of $185,250 plus interest of $35.50 per day accrued from the date of the loan, May 15, 2008 until the date of termination, July 7, 2008, or 53 days at $1881.50 for a total of $247,000 less $187,131.50; and reaffirm that the promissory note is forgiven and need not be repaid now or in the future.

Respectfully submitted,

LEE IRA GARBOWITZ

April 20, 2009

**Exhibit A**

**Supplemental Severance Payment Agreement for**
**Lee Garbowitz**

If the employment of Lee Garbowitz ('Employee') with Indymac is terminated on or before December 31, 2011, and if Employee is eligible to receive a severance payment ("Severance") pursuant to the Indymac Severance Policy in effect on the date of termination of Employee's employment with Indymac, which amounts to less than 12 months of the Employee's base salary in effect on the date of termination of Employee's employment with Indymac, Employee will receive a supplemental severance payment ("Supplemental Severance") in addition to the Severance. The total Severance and Supplemental Severance that Employee would be eligible to receive is 12 months of the Employee's base salary in effect on the date of termination of Employee's employment with Indymac.

The receipt of any severance is conditioned upon Employee's execution of a general release of all claims against Indymac prior to or on the date of Employee's termination.

_____  5/9/08          5/7/2008
Lee Garbowitz          EID#82254

_____
Indymac Bank

## Exhibit B

## PROMISSORY NOTE

$185,250                                                                    May 15, 2008

FOR VALUE RECEIVED, the undersigned,  Lee Garbowitz  (the "Maker") promises to pay to the order of IndyMac Bank, F.S.B. (hereafter, together with any Holder hereof, called "Holder") at the offices of the Holder located at 888 East Walnut Street, Pasadena, California 91101, or at such other place as the Holder may designate in writing to the undersigned, in lawful money of the United States of America, and in immediately available funds, the principal sum of $185,250.

### I. Interest

Interest shall accrue on the aggregate principal balance of all loans from time to time outstanding hereunder from May 15, 2008 until paid in full at a per annum rate equal to seven percent (7.0%) per annum in simple interest terms. Accrued and unpaid interest hereunder shall be computed on the basis of a year of 360 days and the actual number of days elapsed.

Interest shall accrue on any amount past due hereunder at a rate equal to three percent (3.0%) per annum in excess of the interest otherwise payable hereunder.  All such interest shall be due and payable on demand.

### II. Payments

a. The principal balance and accrued and unpaid interest hereunder shall be due and payable on the dates and in such installment amounts indicated on the Payment Schedule attached hereto as Exhibit A (each such amount an "Installment Payment"), or upon earlier prepayment or acceleration as described herein.

b. Except as otherwise provided by the Holder in writing, any regularly scheduled Installment Payments shall be deducted from any earnings payments then due and payable to the Maker from the Holder without prior notice to the Maker, any such notice being hereby expressly waived.

c. In the event that the Maker's employment with the Holder is involuntarily terminated without cause, for poor performance, or in the event of death or disability, then any payment of principal and interest due upon acceleration as described herein shall be deducted from any earnings payments, contractual severance amounts, payments in lieu of accrued vacation or any other cash incentives then due and payable to the Maker from the Holder without prior notice to the Maker, any such notice being hereby expressly waived.

d. Provided no Event of Default has occurred and is continuing, if the return on average equity ("ROE") of the Holder as reported in its Quarterly Report filed on form 10-Q with the Securities and Exchange Commission is twelve percent (12%) or higher for any quarter, then the Holder shall forgive any Installment Payment then due and payable for the quarter immediately following date of such report.

1

**Exhibit B**

**III. Maximum Rate.**

a. In no event shall the amount of interest due or payable under this Note exceed the maximum rate of interest allowed by applicable law and, in the event any such payment is inadvertently paid by the Maker or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless the Maker shall notify the Holder in writing that the Maker elects to have such excess sum returned to it forthwith. It is the express intent of the parties hereto that the Maker not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Maker under applicable law.

b. The Maker, and the Holder by accepting this Note, each agree and stipulate that the only charge imposed upon the Maker for the use of money in connection with this Note is and shall be the interest described in the part I hereof, and further agree and stipulate that other charges imposed by the Holder on the Maker in connection with this Note are charges made to compensate the Holder for underwriting or administrative services and costs or losses performed or incurred and to be performed or incurred, by the Holder in connection with this Note and shall under no circumstances be deemed to be charges for the use of money pursuant to the applicable provisions of California law. All charges other than charges for the use of money shall be fully earned and nonrefundable when due.

**IV. Events of Default.**

Each of the following events shall constitute an "Event of Default" under this Note:

(i) prior to December 31, 2011, the Maker's employment with the Holder shall be terminated for cause or as a result of voluntary resignation or retirement;

(ii) failure of the Maker to pay any principal, interest or other amount due hereunder within fifteen calendar days of the date such payment is due, or the Maker shall in any way fail to comply with the other terms, covenants or conditions contained in this Note;

(iii) any written representation or warranty made at any time by the Maker to the Holder shall prove to have been incorrect or misleading in any material respect when made;

(iv) the Maker shall (a) commence a voluntary case under the United States Bankruptcy Code of 1978, as amended or other bankruptcy law, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts (as now or hereafter in effect); (b) file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts; (c) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; (d) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; (e) be unable to, or admit in writing its inability to, pay its debts as they become due; (f) make a general assignment for the benefit of creditors; or (g) make a conveyance fraudulent as to creditors under any state or federal law;

(v) a case or other proceeding shall be commenced against the Maker in any court of competent jurisdiction seeking (a) relief under the United States Bankruptcy Code of 1978, as amended or other federal bankruptcy law (as now or hereafter in effect) or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts or (b) the appointment of a trustee, receiver, custodian, liquidator or the like for the Maker or all or any substantial part of the assets, domestic or foreign, of the Maker and such suit shall fail to be discharged within ninty (90) days.

**Exhibit B**

**V. Remedies.**

Upon the occurrence of an Event of Default (other than one described in clause (iv) or (v) of the definition thereof), the Holder shall have all other remedies provided at law or equity, including, without limitation, specific performance; and in addition, the Holder, may do one or more of the following: (A) declare all obligations of the Maker hereunder to be immediately due and payable and (B) without prior notice to the Maker, any such notice being hereby expressly waived, to set off and to apply any and all payment due to the Maker from the Holder, (including, but not limited to, earnings payments, severance payments, payments in lieu of accrued vacation or any other cash incentives or payments due to the Maker at the time of such Event of Default), to and for the obligations of the Maker due hereunder.

Upon the occurrence of an Event of Default described in clause (iv) or (v) of the definition thereof, this loan and the undersigned's other obligations hereunder shall immediately be due and payable in full, without any further action on the part of the Holder, and the Holder may exercise any and all rights and remedies available to it at law, in equity or otherwise.

**VI. Fees and Expenses.**

The Maker shall pay all expenses incurred by the Holder in the collection of this Note, including, without limitation, reasonable attorneys' fees, if this Note is collected by or through an attorney-at-law.

**VII. Miscellaneous.**

a. Time is of the essence of this Note.

b. No delay or failure on the part of the Holder in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Holder of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

c. All amendments to this Note, and any waiver or consent of the Holder, must be in writing and signed by the Holder and the Maker.

d. The Maker hereby waives presentment, demand, notice of dishonor, protests, set-off and all other notices whatever.

e. This Note shall be governed by, and construed in accordance with, the laws of the State of California without giving effect to the principles of conflicts of laws.

f. This Note shall be binding upon the successors and assignees of the Maker.

g. A Holder of this Note may assign or transfer this Note to any person or entity without the consent of the Maker; provided, however, that notice of any such assignment or transfer is provided to the Maker.

h. The terms "for cause" and "poor performance" shall be defined pursuant to Indymac's board approved standard form of employment agreement.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Promissory Note as of the date and year first written above.

By:_____

Lee Garbowitz

3

**Exhibit B**

**Exhibit A**

**Installment Payments**

| Quarter | Payment Due | Installment Amount |
|---------|-------------|--------------------|
| Q1 2010 | on or before 3/31/2010 | $27,939.41 |
| Q2 2010 | on or before 6/30/2010 | $27,939.41 |
| Q3 2010 | on or before 9/30/2010 | $27,939.41 |
| Q4 2010 | on or before 12/31/2010 | $27,939.41 |
| Q1 2011 | on or before 3/31/2011 | $27,939.41 |
| Q2 2011 | on or before 6/30/2011 | $27,939.41 |
| Q3 2011 | on or before 9/30/2011 | $27,939.41 |
| Q4 2011 | on or before 12/31/2011 | remaining balance |

4

**Exhibit C**

**Garbowitz, Lee**

| | |
|---|---|
| **From:** | Mathoda, Rayman |
| **Sent:** | Monday, July 07, 2008 1:09 PM |
| **To:** | _Group-3 |
| **Subject:** | <confirm> Must Read: Restructuring of Indymac Bank and Impact on Your Position |
| **Attachments:** | FAQ - July 2008.pdf; Indymac Severance Policy.pdf; Contacts and Resources.pdf; image002.png |



Fifteen years ago we started building Indymac, growing it from a workforce of four in 1993 to a peak of approximately 10,000 in 2007, and, despite declining home prices and a tight credit market, we ended June with a workforce of nearly 7,200 people. During this period we have also had to retrench and rebuild our company several times in response to market forces outside our control and it is with great regret that we must do so again now during this unprecedented crisis we are facing in the mortgage industry.

**What's Happening**
Today, Indymac is curtailing most of our forward mortgage production activities by closing our wholesale and retail loan origination businesses; and refocusing the company on sustaining and growing our retail banking, customer retention, loan servicing and reverse mortgage businesses. This action, while unfortunate and painful for all involved, is critical for Indymac's continued safety and soundness. **As part of this shut down, your position is being eliminated and, with great regret, we must inform you that your employment will be terminated.**

Under the Federal WARN Act and similar state statutes ("WARN"), certain terminations entitle employees to 60 days of advance notice prior to the effective date of the employees' termination and this e-mail serves as your advance notice. A similar letter is being mailed to your home and you should receive it in the next several days. Accordingly, your termination date will be September 8, 2008. This termination will be permanent and Indymac policy does not provide employees subjected to a layoff with the right to "bump" more junior employees in order to retain employment. Indymac has identified Annissa Deshpande, Senior Vice President, as the company official to contact for any further information under WARN. Ms. Deshpande may be reached at (800) 669-2300 ext. 5500 or via e-mail at annissa.deshpande@imb.com.

**Next Steps**
-   Read and print out this e-mail, the attached FAQ and any other

(19)

attachments and feel free to forward them to your personal e-mail address.   **Exhibit C**

## What Happens After Today

While your employment will end on September 8, you are expected to continue working through Tuesday, July 15, unless given different instructions by your manager.  During this time you will continue to receive your regular pay and your benefits will continue.  Per Indymac's vacation policy, employees who are classified as "Outside Sales" do not accrue vacation as they are 100% commissioned (zero base salary) and therefore are not eligible for a vacation payout. This applies to all "Outside Sales" employees, including those who have a draw.  If you are not classified as "Outside Sales" you will continue to accrue vacation, and be compensated for any unused vacation on your termination date, per Indymac's Vacation Policy.  In addition, any incentive compensation you may be due for the Second Quarter will be paid to you on July 31.

As part of Indymac's ongoing efforts to ensure its continued safety and soundness, we have had no choice but to revise our severance policy such that after the 60-day paid notice period, most affected employees will not receive a severance payment.  (Pursuant to Indymac's current severance policy, which was effective July 2, 2008, affected employees with five or more years of service who receive a total of less than $20,000 total cash compensation during their notice period may be eligible to receive the difference between $20,000 and the amount they were paid during the notice period upon execution of a Severance and Release Agreement.)  If you are eligible to receive additional severance pay upon termination, you will receive a follow-up letter at your home address and Indymac's standard Severance and Release Agreement later in July.

## Additional Questions

For further information, please refer to the attached FAQ.  If you have any unanswered questions, you may contact the HR Helpdesk (800) 669-2300, extension 5500 or send an e-mail to HRHelpDesk@imb.com.

On behalf of Indymac's management, thank you for your service to Indymac Bank.  We sincerely regret your departure and wish you success in your life and future endeavors.

Sincerely,

Ray Mathoda
Executive Vice President
Chief Administrative Officer

IMB Logo

Exhibit D

### July 2008 Indymac Bank Restructuring
### Frequently Asked Questions
### Specialty List

## Questions About Employment Agreements

**Q: Will I receive the severance package as outlined in my employment agreement Section 5.2.5 upon my employment termination date?**
**A:** No.  Indymac may not pay out the cash amounts, long-term incentive award accelerations, and/or other benefits designated in Section 5.2.5 of your employment agreement due to FDIC regulations applicable to Indymac (see Section 8.10.6 of your employment agreement).  As a result, employees impacted by this layoff are only eligible for severance under Indymac's standard Severance Policy.  See general FAQ for further information on the Severance Policy and the treatment of short-term cash incentive amounts.

## Questions About Supplemental Severance Payment Agreements

**Q: Will I receive the severance amount under my supplemental severance payment agreement upon my employment termination date?**
**A:** No.  Indymac may not pay out the cash amounts designated in your supplemental severance payment agreement due to FDIC regulations applicable to Indymac.  As a result, employees impacted by this layoff are only eligible for severance under Indymac's standard Severance Policy.  See general FAQ for further information on the Severance Policy.

## Questions About Retention Loans

**Q: Do I have to re-pay the retention loan I received?**
**A:** No.  Under the Promissory Note you signed prior to receipt of the loan, the loan principal balance and accrued interest are not accelerated (i.e., due) in the event of an involuntary termination without cause (i.e., a layoff).

**Q: How does this impact my 2008 income and taxes?**
**A:** As a result of the above, the retention loan balance will be part of your 2008 W2 income.  This means that you will be responsible for any tax obligation on this amount.

## Questions About Standard Deferred Compensation Plan Balances

**Q: What happens to my balance in the Indymac Bank Standard Deferred Compensation Plan?**
**A:** Within 2-4 weeks after your employment termination date, if you are not considered a "specified employee", you will receive a payment of your plan balance as of your

termination date.  Federal and state taxes will be withheld from the payment based on your effective tax rates.  No other deductions will be withheld from this payment.

If you are considered a "specified employee", under IRS regulations, you must wait 6 months from your employment termination date to receive a payout of your plan balance.  After 6 months, you will receive a payment, with Federal and state taxes withheld, based on the balance as of the payment date (you will continue to earn interest during the 6 month period).  Under IRS regulations, specified employees are generally the top 50 compensated employees for a given time period and are set at the beginning of the year for each calendar year.  Please contact Jennifer Pikoos, FVP HR, at (626) 535-5834 if you have any questions.

## Questions About Senior Manager Long-Term Incentives (Restricted/Deferred Cash or Equity)

### Q: What happens to the unvested/outstanding balances of my long-term incentive awards?
A: Any unvested long-term incentive awards, including equity or restricted/deferred cash, will be cancelled on your employment termination date.  Amounts scheduled to vest up to your employment termination date will be paid to you.  If you qualify for retirement as defined under Indymac's publicly filed incentive plans, you may be eligible to receive an acceleration of vesting of your unvested long-term incentive awards.   Eligibility is based on a combination of continuous years of service (minimum of 5) and age.  Please contact Jennifer Pikoos, FVP HR, at (626) 535-5834 if you think you may be eligible.

**Indymac Resources, Inc.**
155 N Lake Ave
Pasadena CA  91101-1892

**Exhibit E**

| | |
|---|---|
| Pay Group: | SAL IMR Salaried Exempt |
| Pay Begin Date: | 09/01/2008 |
| Pay End Date: | 09/08/2008 |
| Business Unit: | IMR87 |
| Check #: | 000000000926810 |
| Check Date: | 09/08/2008 |

Lee Ira Garbowitz
3121 Oakdell Ln
Studio City CA

| | |
|---|---|
| Employee ID: | 82284 |
| Department: | 000192-Wage & Hour Compliance |
| Location: | Pasadena Headquarters |
| Job Title: | SVP |
| Pay Rate: | $20,583.33 Monthly |

**TAX DATA:** Federal / CA State
Marital Status: Married / Married (one income)
Allowances: 7 / 7
Addl. Pct.:
Addl. Amt.:

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular Pay | 118.749998 | 32.00 | ███ | 1,232.00 | ███ |
| Holiday Pay - Salaried | 118.749998 | 8.00 | ███ | 48.00 | ███ |
| Vacation Payout | 118.749998 | 71.00 | ███ | 71.00 | ███ |
| Vacation - Salaried | | | 0.00 | 56.00 | ███ |
| Bonus Deferred Cash | | | 0.00 | | ███ |
| WARN Pay | | | 0.00 | | |
| Retention Loan | | | 0.00 | 185,250.00 | |
| Sr.Mgr Metrics Based Incentive | | | 0.00 | | ███ |
| License Plate Credit | | | 0.00 | | ███ |
| Group Term Life | | | ███ | | |

Total Gross Wages: 111.00 ███ 1,407.00 ███
Total Adjusted Gross Wages:

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Medical | ███ | ███ |
| Dental | ███ | ███ |
| Vision | ███ | |
| 401k | ███ | ███ |
| Health Care - FSA | ███ | ███ |
| Dependent Care - FSA | ███ | ███ |

Total Before Tax Deductions: ███

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | ███ | ███ |
| Fed MED/EE | ███ | ███ |
| Fed SS/EE | ███ | ███ |
| CA Withholdng | ███ | ███ |
| CA SDI/EE | ███ | ███ |

Total Taxes: ███ ███

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Parking Fee | ███ | ███ |
| Executive Physician Program | | ███ |

Total After Tax Deductions: 0.00 1,640.00

### OTHER

| Description | Current | YTD |
|---|---|---|
| | ███ | ███ |
| | ███ | ███ |
| | ███ | ███ |
| | ███ | ███ |
| | ███ | ███ |

Total Other: 0.00 0.00

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | ███ | ███ | ███ | ███ | ███ |
| YTD: | | | | | |

| VAC HOURS | YTD | SICK HOURS | YTD | FLOATING HOLIDAY | YTD |
|---|---|---|---|---|---|
| Start Balance: | 26.0 | Start Balance: | 36.0 | Start Balance: | 0.0 |
| + Earned: | 80.0 | + Earned: | 32.0 | + Earned: | |
| - Taken: | 111.0 | - Taken: | | - Taken: | |
| + Adjustments: | | + Adjustments: | | + Adjustments: | |
| End Balance: | 0.0 | End Balance: | 68.0 | End Balance: | 0.0 |

### NET PAY DISTRIBUTION
Check #000000000926810 ███
Total: ███

MESSAGE:

**Exhibit F**

September 12, 2008

**By Certified Mail**

**FDIC as Receiver of IndyMac Bank, F.S.B.**
**1601 Bryan Street**
**Dallas, TX 75201**
**Attention: Claims Agent**

**Re: Claim in Receivership of IndyMac Bank, F.S.B.**

Dear Sirs:

I hereby file a claim in the receivership of IndyMac Bank, F.S.B. ("Bank").

I am a former employee of the Bank, and hold a **Supplemental Severance Payment Agreement**
**with the Bank, a copy of which is attached. As part of my usual and regular compensation**
package, I am entitled to certain severance benefits under that agreement, which is set forth
relating to termination of my employment without cause.  The amount that I am entitled to is
**equal to 12 months of base salary which was $247,000 at time of termination.**

I hereby make a claim for all amounts due to me under my severance rights, as well as any other
benefits owed to be that have been approved by the FDIC.

I also am the maker of a promissory note, attached to this claim letter, in the amount of $185,250.
**I hereby setoff amounts I owe under the promissory note against amounts owed to me under my**
severance agreement, which results in the promissory note being repaid in full.

I request that the FDIC deem the unpaid amount of **$61,750 to constitute my remaining claim**
(which I understand may be a general claim in the receivership).

If there are additional materials or information that the FDIC requires, please notify me
immediately in writing at my address noted in this letter.

Very truly yours,

Lee Garbowitz
3121 Oakdell Lane
Studio City, CA 91604

Home – 323-654-6937
Cell – 323-703-4913
eMail – lee@garbowiiz.com

Attachments:
Federal Deposit Insurance Corporation Proof of Claim
Supplemental Severance Payment Agreement for Lee Garbowitz
Promissory Note for Lee Garbowitz
July 7th 2008 Indymac Bank Restructuring FAQ Specialty List

**Exhibit F**

**Federal Deposit Insurance Corporation as Receiver for:**
**10007 – IndyMac Bank, F.S.B. Pasadena, CA**
(Name of Bank/Financial Institution and Location)

## PROOF OF CLAIM

SSN/Tax ID # (1) 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

The undersigned; (2) Lee Garbowitz
(Name of person making the claim)

says that the IndyMac Bank, F.S.B. now in liquidation is
(Name of Bank/Financial Institution)

justly indebted to (3) Lee Garbowitz in the sum of
(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4) $61,750.00 Dollars upon the following Claim:

| | Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| CLAIMS | Net severance owed | 1 | 61,750.00 |
| | | Total Claim:(6) | 61,750.00 |

The undersigned further states that he/she makes this claim on behalf of

(7) Lee Garbowitz,

that no part of said debt has been paid, that

(8) Lee Garbowitz
(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

NAME (9) [signature] (Signature of Person making the Claim) ______ (Title)

FIRM ______ (If applicable)

ADDRESS (10) 3121 Oakdell Lane

CITY/STATE/ZIP Studio City CA 91604

TELEPHONE NUMBER 323-654-6937

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. Section 1007).

RLS7212

**Exhibit F**

## Supplemental Severance Payment Agreement for
### Lee Garbowitz

If the employment of Lee Garbowitz ('Employee') with Indymac is terminated on or before December 31, 2011, and if Employee is eligible to receive a severance payment ("Severance") pursuant to the Indymac Severance Policy in effect on the date of termination of Employee's employment with Indymac, which amounts to less than 12 months of the Employee's base salary in effect on the date of termination of Employee's employment with Indymac, Employee will receive a supplemental severance payment ("Supplemental Severance") in addition to the Severance. The total Severance and Supplemental Severance that Employee would be eligible to receive is 12 months of the Employee's base salary in effect on the date of termination of Employee's employment with Indymac.

The receipt of any severance is conditioned upon Employee's execution of a general release of all claims against Indymac prior to or on the date of Employee's termination.

_____   5/9/0?          5/7/2008
Lee Garbowitz          EID#82254

_____
Indymac Bank

X

**Exhibit F**

**PROMISSORY NOTE**

$185,250                                                                                           May 15, 2008

FOR VALUE RECEIVED, the undersigned,  Lee Garbowitz  (the "Maker") promises to pay to the
order of IndyMac Bank, F.S.B. (hereafter, together with any Holder hereof, called "Holder") at the offices of the
Holder located at 888 East Walnut Street, Pasadena, California 91101, or at such other place as the Holder
may designate in writing to the undersigned, in lawful money of the United States of America, and
in immediately available funds, the principal sum of $185,250.

**I. Interest**

Interest shall accrue on the aggregate principal balance of all loans from time to time outstanding hereunder
from May 15, 2008 until paid in full at a per annum rate equal to seven percent (7.0%) per annum in simple
interest terms. Accrued and unpaid interest hereunder shall be computed on the basis of a year of 360 days
and the actual number of days elapsed.

Interest shall accrue on any amount past due hereunder at a rate equal to three percent (3.0%) per annum in
excess of the interest otherwise payable hereunder.  All such interest shall be due and payable on demand.

**II. Payments**

a. The principal balance and accrued and unpaid interest hereunder shall be due and payable on the dates
and in such installment amounts indicated on the Payment Schedule attached hereto as Exhibit A (each such
amount an "Installment Payment"), or upon earlier prepayment or acceleration as described herein.

b. Except as otherwise provided by the Holder in writing, any regularly scheduled Installment Payments shall
be deducted from any earnings payments then due and payable to the Maker from the Holder without prior
notice to the Maker, any such notice being hereby expressly waived.

c. In the event that the Maker's employment with the Holder is involuntarily terminated without cause, for poor
performance, or in the event of death or disability, then any payment of principal and interest due upon
acceleration as described herein shall be deducted from any earnings payments, contractual severance
amounts, payments in lieu of accrued vacation or any other cash incentives then due and payable to the
Maker from the Holder without prior notice to the Maker, any such notice being hereby expressly waived.

d. Provided no Event of Default has occurred and is continuing, if the return on average equity ("ROE") of the
Holder as reported in its Quarterly Report filed on form 10-Q with the Securities and Exchange Commission is
twelve percent (12%) or higher for any quarter, then the Holder shall forgive any Installment Payment then
due and payable for the quarter immediately following date of such report.

1

### III. Maximum Rate.

a. In no event shall the amount of interest due or payable under this Note exceed the maximum rate of interest allowed by applicable law and, in the event any such payment is inadvertently paid by the Maker or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless the Maker shall notify the Holder in writing that the Maker elects to have such excess sum returned to it forthwith.  It is the express intent of the parties hereto that the Maker not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Maker under applicable law.

b. The Maker, and the Holder by accepting this Note, each agree and stipulate that the only charge imposed upon the Maker for the use of money in connection with this Note is and shall be the interest described in the part I hereof, and further agree and stipulate that other charges imposed by the Holder on the Maker in connection with this Note are charges made to compensate the Holder for underwriting or administrative services and costs or losses performed or incurred and to be performed or incurred, by the Holder in connection with this Note and shall under no circumstances be deemed to be charges for the use of money pursuant to the applicable provisions of California law.  All charges other than charges for the use of money shall be fully earned and nonrefundable when due.

### IV. Events of Default.

Each of the following events shall constitute an "Event of Default" under this Note:

(i) prior to December 31, 2011, the Maker's employment with the Holder shall be terminated for cause or as a result of voluntary resignation or retirement;

(ii) failure of the Maker to pay any principal, interest or other amount due hereunder within fifteen calendar days of the date such payment is due, or the Maker shall in any way fail to comply with the other terms, covenants or conditions contained in this Note;

(iii) any written representation or warranty made at any time by the Maker to the Holder shall prove to have been incorrect or misleading in any material respect when made;

(iv) the Maker shall (a) commence a voluntary case under the United States Bankruptcy Code of 1978, as amended or other bankruptcy law, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts (as now or hereafter in effect); (b) file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts; (c) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; (d) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; (e) be unable to, or admit in writing its inability to, pay its debts as they become due; (f) make a general assignment for the benefit of creditors; or (g) make a conveyance fraudulent as to creditors under any state or federal law;

(v) a case or other proceeding shall be commenced against the Maker in any court of competent jurisdiction seeking (a) relief under the United States Bankruptcy Code of 1978, as amended or other federal bankruptcy law (as now or hereafter in effect) or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts or (b) the appointment of a trustee, receiver, custodian, liquidator or the like for the Maker or all or any substantial part of the assets, domestic or foreign, of the Maker and such suit shall fail to be discharged within ninety (90) days.

**Exhibit F**

**V. Remedies.**

Upon the occurrence of an Event of Default (other than one described in clause (iv) or (v) of the definition thereof), the Holder shall have all other remedies provided at law or equity, including, without limitation, specific performance; and in addition, the Holder, may do one or more of the following: (A) declare all obligations of the Maker hereunder to be immediately due and payable and (B) without prior notice to the Maker, any such notice being hereby expressly waived, to set off and to apply any and all payment due to the Maker from the Holder, (including, but not limited to, earnings payments, severance payments, payments in lieu of accrued vacation or any other cash incentives or payments due to the Maker at the time of such Event of Default), to and for the obligations of the Maker due hereunder.

Upon the occurrence of an Event of Default described in clause (iv) or (v) of the definition thereof, this loan and the undersigned's other obligations hereunder shall immediately be due and payable in full, without any further action on the part of the Holder, and the Holder may exercise any and all rights and remedies available to it at law, in equity or otherwise.

**VI. Fees and Expenses.**

The Maker shall pay all expenses incurred by the Holder in the collection of this Note, including, without limitation, reasonable attorneys' fees, if this Note is collected by or through an attorney-at-law.

**VII. Miscellaneous.**

a. Time is of the essence of this Note.

b. No delay or failure on the part of the Holder in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Holder of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

c. All amendments to this Note, and any waiver or consent of the Holder, must be in writing and signed by the Holder and the Maker.

d. The Maker hereby waives presentment, demand, notice of dishonor, protests, set-off and all other notices whatever.

e. This Note shall be governed by, and construed in accordance with, the laws of the State of California without giving effect to the principles of conflicts of laws.

f. This Note shall be binding upon the successors and assignees of the Maker.

g. A Holder of this Note may assign or transfer this Note to any person or entity without the consent of the Maker; provided, however, that notice of any such assignment or transfer is provided to the Maker.

h. The terms "for cause" and "poor performance" shall be defined pursuant to Indymac's board approved standard form of employment agreement.

**IN WITNESS WHEREOF, the undersigned has executed and delivered this Promissory Note as of the date and year first written above.**

By: _____

Lee Garbowitz

3

**Exhibit F**

**Exhibit A**

**Installment Payments**

| Quarter | Payment Due | Installment Amount |
|---|---|---|
| Q1 2010 | on or before 3/31/2010 | $27,939.41 |
| Q2 2010 | on or before 6/30/2010 | $27,939.41 |
| Q3 2010 | on or before 9/30/2010 | $27,939.41 |
| Q4 2010 | on or before 12/31/2010 | $27,939.41 |
| Q1 2011 | on or before 3/31/2011 | $27,939.41 |
| Q2 2011 | on or before 6/30/2011 | $27,939.41 |
| Q3 2011 | on or before 9/30/2011 | $27,939.41 |
| Q4 2011 | on or before 12/31/2011 | remaining balance |

4

**Exhibit F**



# July 2008 Indymac Bank Restructuring
# Frequently Asked Questions
# Specialty List

## Questions About Employment Agreements

**Q: Will I receive the severance package as outlined in my employment agreement Section 5.2.5 upon my employment termination date?**
**A:** No.  Indymac may not pay out the cash amounts, long-term incentive award accelerations, and/or other benefits designated in Section 5.2.5 of your employment agreement due to FDIC regulations applicable to Indymac (see Section 8.10.6 of your employment agreement).  As a result, employees impacted by this layoff are only eligible for severance under Indymac's standard Severance Policy.  See general FAQ for further information on the Severance Policy and the treatment of short-term cash incentive amounts.

## Questions About Supplemental Severance Payment Agreements

**Q: Will I receive the severance amount under my supplemental severance payment agreement upon my employment termination date?**
**A:** No.  Indymac may not pay out the cash amounts designated in your supplemental severance payment agreement due to FDIC regulations applicable to Indymac.  As a result, employees impacted by this layoff are only eligible for severance under Indymac's standard Severance Policy.  See general FAQ for further information on the Severance Policy.

## Questions About Retention Loans

**Q: Do I have to re-pay the retention loan I received?**
**A:** No.  Under the Promissory Note you signed prior to receipt of the loan, the loan principal balance and accrued interest are not accelerated (i.e., due) in the event of an involuntary termination without cause (i.e., a layoff).

**Q: How does this impact my 2008 income and taxes?**
**A:** As a result of the above, the retention loan balance will be part of your 2008 W2 income.  This means that you will be responsible for any tax obligation on this amount.

## Questions About Standard Deferred Compensation Plan Balances

**Q: What happens to my balance in the Indymac Bank Standard Deferred Compensation Plan?**
**A:** Within 2-4 weeks after your employment termination date, if you are not considered a "specified employee", you will receive a payment of your plan balance as of your



### Exhibit F

termination date. Federal and state taxes will be withheld from the payment based on your effective tax rates. No other deductions will be withheld from this payment.

If you are considered a "specified employee", under IRS regulations, you must wait 6 months from your employment termination date to receive a payout of your plan balance. After 6 months, you will receive a payment, with Federal and state taxes withheld, based on the balance as of the payment date (you will continue to earn interest during the 6 month period). Under IRS regulations, specified employees are generally the top 50 compensated employees for a given time period and are set at the beginning of the year for each calendar year. Please contact Jennifer Pikoos, FVP HR, at (626) 535-5834 if you have any questions.

## Questions About Senior Manager Long-Term Incentives (Restricted/Deferred Cash or Equity)

### Q: What happens to the unvested/outstanding balances of my long-term incentive awards?

**A:** Any unvested long-term incentive awards, including equity or restricted/deferred cash, will be cancelled on your employment termination date. Amounts scheduled to vest up to your employment termination date will be paid to you. If you qualify for retirement as defined under Indymac's publicly filed incentive plans, you may be eligible to receive an acceleration of vesting of your unvested long-term incentive awards. Eligibility is based on a combination of continuous years of service (minimum of 5) and age. Please contact Jennifer Pikoos, FVP HR, at (626) 535-5834 if you think you may be eligible.

**FDIC**

**Exhibit G**

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED – 7008 1830 0000 8033 4973**

February 19, 2009

Lee Garbowitz
3121 Oakdell Lane
Studio City, CA 91604

SUBJECT:     10007– IndyMac Bank, F.S.B.
             Pasadena, CA – In Receivership
             <u>NOTICE OF DISALLOWANCE OF CLAIM</u>

Dear Claimant:

The Receiver of IndyMac Bank, F.S.B. has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s):

> The payment specified by the Supplemental Severance Agreement was contingent on termination at a time of financial distress. Thus any payment pursuant to the agreement violates 12 C.F.R. Part 359 prohibiting golden parachutes.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-2665.

Sincerely,

Jeffry M. Quick
Claims Agent
Claims Department

RLS7218

## 12 C.F.R Part 359.1 (f) – FDIC Definition of Golden Parachute Payment

(f) *Golden parachute payment.* (1) The term *golden parachute payment* means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or an affiliated depository institution holding company for the benefit of any current or former IAP pursuant to an obligation of such institution or holding company that:

(i) Is contingent on, or by its terms is payable on or after, the termination of such party's primary employment or affiliation with the institution or holding company; and

(ii) Is received on or after, or is made in contemplation of, any of the following events:

(A) The insolvency (or similar event) of the insured depository institution which is making the payment or bankruptcy or insolvency (or similar event) of the depository institution holding company which is making the payment; or

(B) The appointment of any conservator or receiver for such insured depository institution; or

(C) A determination by the insured depository institution's or depository institution holding company's appropriate federal banking agency, respectively, that the insured depository institution or depository institution holding company is in a troubled condition, as defined in the applicable regulations of the appropriate federal banking agency (§303.101(c) of this chapter); or

(D) The insured depository institution is assigned a composite rating of 4 or 5 by the appropriate federal banking agency or informed in writing by the Corporation that it is rated a 4 or 5 under the Uniform Financial Institutions Rating System of the Federal Financial

Institutions Examination Council, or the depository institution holding company is assigned a composite rating of 4 or 5 or unsatisfactory by its appropriate federal banking agency; or

(E) The insured depository institution is subject to a proceeding to terminate or suspend deposit insurance for such institution; and

(iii)(A) Is payable to an IAP whose employment by or affiliation with an insured depository institution is terminated at a time when the insured depository institution by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii) (A) through (E) of this section, or in contemplation of any of these conditions; or

(B) Is payable to an IAP whose employment by or affiliation with an insured depository institution holding company is terminated at a time when the insured depository institution holding company by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii)(A), (C) or (D) of this section, or in contemplation of any of these conditions.

(2) *Exceptions.* The term *golden parachute payment* shall not include:

(i) Any payment made pursuant to a pension or retirement plan which is qualified (or is intended within a reasonable period of time to be qualified) under section 401 of the Internal Revenue Code of 1986 (26 U.S.C. 401) or pursuant to a pension or other retirement plan which is governed by the laws of any foreign country; or

(ii) Any payment made pursuant to a benefit plan as that term is defined in paragraph (c) of this section; or

(iii) Any payment made pursuant to a *bona fide* deferred compensation plan or arrangement as defined in paragraph (d) of

this section; or

(iv) Any payment made by reason of death or by reason of termination caused by the disability of an institution-affiliated party; or

(v) Any payment made pursuant to a nondiscriminatory severance pay plan or arrangement which provides for payment of severance benefits to all eligible employees upon involuntary termination other than for cause, voluntary resignation, or early retirement; *provided, however,* that no employee shall receive any such payment which exceeds the base compensation paid to such employee during the twelve months (or such longer period or greater benefit as the Corporation shall consent to) immediately preceding termination of employment, resignation or early retirement, and such severance pay plan or arrangement shall not have been adopted or modified to increase the amount or scope of severance benefits at a time when the insured depository institution or depository institution holding company was in a condition specified in paragraph (f)(1)(ii) of this section or in contemplation of such a condition without the prior written consent of the appropriate federal banking agency; or

(vi) Any severance or similar payment which is required to be made pursuant to a state statute or foreign law which is applicable to all employers within the appropriate jurisdiction (with the exception of employers that may be exempt due to their small number of employees or other similar criteria); or

(vii) Any other payment which the Corporation determines to be permissible in accordance with §359.4.

## Exhibit I

Appendix 4
Chronology of Events

---

6/27/2008
IndyMac begins to provide hourly deposit outflow information and daily cash flow reports to OTS. The daily cash flow reports show the following net deposit outflows from June 27 to July 11, 2008 totaling $1.55 billion.

| | |
|---|---|
| 6/27/2008 (Friday) | $4.5 million |
| 6/28/2008 (Saturday | $78.2 million |
| 6/29/2008 (Sunday) | $118,000 |
| 6/30/2008 (Monday) | $84.5 million |
| 7/1/2008 (Tuesday) | $205.6 million |
| 7/2/2008 (Wednesday) | $147.4 million |
| 7/3/2008 (Thursday) | $128.7 million |
| 7/4/2008 (Friday) | $238,000 |
| 7/5/2008 (Saturday) | $45.8 million |
| 7/6/2008 (Sunday) | $132,000 |
| 7/7/2008 (Monday) | $97.5 million |
| 7/8/2008 (Tuesday) | $185.1 million |
| 7/9/2008 (Wednesday) | $209.2 million |
| 7/10/2008 (Thursday) | $115.0 million |
| 7/11/2008 (Friday) | $250.0 million (Date Closed) |

7/1/2008
OTS sent a Troubled Condition Letter to IndyMac, which did the following:

- restricted changes in management or the board composition;
- restricted transactions with affiliates
- established growth restrictions and dividend payments restrictions
- restricted severance payments and other "golden parachute payments"
- removed qualification for expedited treatment of applications and notices filed with OTS and notified the thrift it was now subject to higher assessments

7/1/2008
OTS issued a Supervisory Directive to IndyMac which required IndyMac to:

- finalize a new operating plan and submit it for OTS approval within 20 days
- report progress on meeting the approved plan

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV09- 2713 DSF (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

FOR OFFICE USE ONLY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Lee Ira Garbowitz

                                   PLAINTIFF(S)

v.

United States of America,
United States Treasury,
FDIC as Receiver of Indymac
Bank F.S.B.

                                   DEFENDANT(S).

CASE NUMBER

**CV09 2713 · DSF(VBKx)**

**SUMMONS**

---

TO:   DEFENDANT(S): United States of America, United States Treasury, FDIC as Receiver of Indymac Bank F.S.B.

A lawsuit has been filed against you.

Within **60** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Lee Ira Garbowitz, in pro per, whose address is **3121 Oakdell Lane, Studio City CA 91604**. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

FOR OFFICE USE ONLY

Dated: **4-20-09**

Clerk, U.S. District Court

SEAL

By: _____

                            Deputy Clerk

*(Seal of the Court)*

---

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

FOR OFFICE USE ONLY

**SUMMONS**